## STATE OF CONNECTICUT *v.* CLYDE MEIKLE
## (AC 20516)

Foti, Zarella and Dupont, Js.

Argued September 25—officially released November 21, 2000

*Martin Zeldis*, assistant public defender, for the appellant (defendant).

*Robert M. Spector*, deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Donna Mambrino*, assistant state's attorney, for the appellee (state).

FOTI, J. The defendant, Clyde Meikle, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a.[1] On appeal, the defendant contends that the trial court improperly (1) rejected his claim that the state, during jury selection, exercised a peremptory challenge in a racially discriminatory manner, (2) permitted certain opinion testimony and (3) denied his motion to strike certain testimony and allowed the state to open its case-in-chief to introduce further evidence. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On November 1, 1994, at approximately 7 p.m. in the rear parking lot of 297-299 Enfield Street in Hartford, the defendant and the victim, Clifford Walker, became involved in a dispute. The dispute resulted in each yelling and cursing at the other. The argument began because the victim wanted the defendant to move his car, which the defendant did not move quickly enough. The argument did not stop even after the defendant

---

[1] General Statutes § 53a-54a provides: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a) of this section, on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony or murder under section 53a-54d."

moved his car. The defendant subsequently walked to the passenger side of his car, withdrew a sawed-off shotgun from the car and approached the victim. After seeing the weapon, the victim raised his hands with his palms facing out and said, "What are you going to do, shoot me?" The defendant, standing about four feet away, said, "Fuck you," and shot and killed the victim. The defendant then fled, discarded the weapon and spent two days hiding from authorities in New Haven. Police officers arrested the defendant when he returned to Hartford to retrieve some money. The defendant stated to the police that the shooting was accidental but refused to give a sworn statement.

## I

The defendant claims that the state violated his rights under the equal protection clause of the fourteenth amendment to the United States constitution[2] by exercising a peremptory challenge in a racially discriminatory manner. We disagree.

The following additional facts and procedural history are necessary to our resolution of this claim. The court initially gave the state and the defendant each eighteen peremptory challenges. The defendant is African-American. Counsel questioned J,[3] an African-American female, on the second day of jury selection. When asked by the assistant state's attorney if she had ever been the victim of a crime, J described an incident that occurred one year earlier at a restaurant in Manchester.[4]

---

[2] The fourteenth amendment to the United States constitution provides in relevant part that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

[3] We have chosen not to use the name of the venireperson to protect her privacy.

[4] The relevant portion of the voir dire is as follows:

"[Assistant State's Attorney]: . . . Have you yourself ever been the victim of a violent crime?

"[J]: Yes.

"Q. Could you tell me a little bit about that?

"A. It wasn't violent, but it happened in Manchester last year when this

She recalled that while sitting at an empty booth near the entrance to the restaurant waiting for her take-out

man told me to get up out of a seat in a restaurant, and I told him I wouldn't move until my lunch was ready. I had asked the man to have a seat, but he told me to get up and that was it, and he followed me out of the restaurant, and I told him he had violated my civil rights as an American woman, as a black American woman.

"Q. And what happened?

"A. They arrested him.

"Q. They arrested him?

"A. Uh-huh.

"Q. Do you know what happened to him?

"A. Yeah, he got a year supervised probation and a five hundred dollar fine that he was supposed to donate to the [National Association for the Advancement of Colored People].

"Q. As a result of that experience and as a result of what happened to that defendant in that case, where you were the victim, do you feel that you were treated fairly as a victim?

"A. I believe that the system worked.

"Q. So you think you were treated fairly?

"A. Uh-huh.

"Q. Okay, when you went through that experience last year, as a victim, do you remember coming into contact with anybody from the court?

"A. Just the prosecutor, and I brought my lawyer in just to be there with me. That was it, and Officer Ravoired, the policeman that took down my statement.

"Q. Okay, and do you remember who the prosecutor was?

"A. Oh, my Lord, no. It was a woman prosecutor, though. I don't remember her name.

"Q. Do I look familiar to you at all?

"A. I've never seen you before.

"Q. Okay, because I used to work in Manchester.

"A. Yeah?

"Q. I was a prosecutor in Manchester.

"A. You're not the one, though.

"Q. And I know exactly what case you're talking about. That's why I'm asking you about it.

"A. Oh, I don't remember you.

"Q. Okay.

"A. Okay.

"Q. But the fact that I was a prosecutor in Manchester and I know your case —

"A. Uh-huh.

"Q. —would that affect your ability to sit on this case as a fair and impartial juror?

"A. No."

order, a man told her to get up and let him sit at her booth. She said that he followed her out of the restaurant, where she told him that his conduct toward her violated her civil rights "as an American woman, as a black American woman." The police arrested the man after J filed a complaint. At trial, the court convicted, fined and sentenced him to probation. J later said that she believed she had been treated fairly following the incident.

The assistant state's attorney next informed J that she had worked as a prosecutor in Manchester when that incident occurred and that she specifically recalled the case. When questioned, J responded that she did not know the assistant state's attorney. At the conclusion of J's examination, the assistant state's attorney told the court that she faced a "bizarre problem" because she thoroughly recalled the details surrounding the incident and believed that J had acted in an especially difficult manner during the prosecution of that case. She stated that she did not believe J truthfully conveyed her feelings about the incident and that J was "not telling us the whole story . . . ." Although the assistant state's attorney never clearly stated to the court that she was moving to excuse J for cause, defense counsel raised an objection to the court's considering a challenge for cause on the basis of facts that were not elicited during questioning of J. After the state exercised a peremptory challenge, defense counsel raised a *Batson* challenge, arguing that the state failed to set forth a race neutral reason for its use of a peremptory challenge. The assistant state's attorney argued that race neutral characteristics that she knew about J made her uncomfortable having J serve as a juror. The assistant state's attorney stated: "I know this person as a result of my official capacity, and I know something about her that causes me to feel the need to exercise a peremptory challenge."

After the court expressed concern about deciding the issue on the basis of facts that were not on the record, the assistant state's attorney made an offer of proof. The state gave four reasons for seeking to excuse J, arguing that several areas of J's voir dire raised questions about her ability to serve as a juror. First, the state pointed out that J expressed difficulty in applying the law to the facts found in the case. Second, the state noted its concern with J's initial response when asked if she could sit in judgment of others.[5] Third, the state recalled that J hesitated when asked if she could be a fair and impartial juror to both sides in the case.[6]

The assistant state's attorney also provided the court with additional details of the incident that occurred at the restaurant. In the opinion of the assistant state's attorney, the initial argument occurred simply because the man asked J for her seat so he could dine at the restaurant. The assistant state's attorney said that on the basis of statements from others who were at the restaurant that night, the confrontation did not involve racial issues. The assistant state's attorney said that her ultimate decision to have the man arrested derived from his conduct outside the restaurant, where he had continued to argue with J. She stressed that at one point after the incident, J had threatened to sue every entity connected with the incident, and that she did not want

---

[5] The relevant portion of the voir dire is as follows:

"[Assistant State's Attorney]: Okay, do you have any problem sitting in judgment of other people?

"[J]: He who judges will be judged. Yes, I do, I do.

"Q. As a juror, that is basically your function.

"A. I know."

[6] The state's attorney addressed the court on this issue, noting that "especially, I had a problem that when I asked her, 'Do you think you could be a fair and impartial juror both to the state and to the defendant?' there was a very, very long hesitation before her answer. There wasn't hesitation in any of her answers except for that one, and it was a very long hesitation before she gave an answer and then she said yes . . . ."

someone on the jury who behaved in such an emotional and irrational manner.

Defense counsel argued that none of J's responses in other areas of the voir dire questioning raised concerns. Defense counsel asserted that one could not characterize the assistant state's attorney's concerns regarding J's behavior during and following the incident as race neutral. The defense contended that it would not be race neutral if the state could use a peremptory challenge to excuse J simply because J had brought a civil rights claim that ultimately resulted in a conviction. The assistant state's attorney once more addressed the issue, noting that the reasons for wanting to excuse J related not to the civil rights claim but to J's behavior during the prosecution of that claim.

The court denied the defendant's challenge pursuant to *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), on the basis of all four reasons proffered by the state. The court found that J's answers in the three areas of voir dire questioning that were not related to the restaurant incident warranted a valid, race neutral exercise of a peremptory challenge by the state. Noting that the incident at the restaurant did not constitute the only reason offered by the state to challenge J, and since no for cause motion to challenge J had been made, the court declined to hold a separate hearing to resolve questions surrounding that issue on the record.

Our Supreme Court has summarized the applicable law as follows: "In *Batson* [v. *Kentucky*, supra, 476 U.S. 79] the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as

a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race . . . . *State* v. *Robinson*, [237 Conn. 238, 243–44, 676 A.2d 384 (1996)]. Relying on the rationale underlying *Batson*, the United States Supreme Court has held that gender-based challenges also are impermissible. *J.E.B.* v. *Alabama ex rel. T.B.*, [511 U.S. 127, 146, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994)].

"Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established purposeful discrimination. . . . The [party asserting the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination. . . .

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race or gender]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race [or gender] were asked a question to elicit a partic-

ular response that was not asked of the other jurors . . . (4) persons with the same or similar characteristics but not the same race [or gender] as the challenged juror were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race [or gender]. . . .

"In assessing the reasons proffered in support of the use of a peremptory challenge . . . [a]n explanation . . . need not . . . be pigeon-holed as wholly acceptable or wholly unacceptable . . . and even where the acceptability of a particular explanation is doubtful, the inquiry is not at an end. In deciding the ultimate issue of discriminatory intent, the judicial officer is entitled to assess each explanation in light of all the other evidence relevant to prosecutorial intent. The officer may think a dubious explanation undermines the bona fides of other explanations or may think that the sound explanations dispel the doubt raised by a questionable one. As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances. . . . *United States* v. *Alvarado*, [951 F.2d 22, 26 (2d Cir. 1991)]. . . .

"Finally, the trial court's decision on the question of discriminatory intent represents a finding of fact that will necessarily turn on the court's evaluation of the demeanor and credibility of the attorney of the party exercising the peremptory challenge. *Hernandez* v. *New York*, 500 U.S. 352, 365, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991); *Batson* v. *Kentucky*, supra, 476 U.S. 98 n.21; *United States* v. *Alvarado*, supra, 951 F.2d 25; *State* v. *Gonzalez*, [206 Conn. 391, 395, 538 A.2d 210 (1988)]. Accordingly, a trial court's determination that there has or has not been intentional discrimination is

afforded great deference and will not be disturbed unless it is clearly erroneous. *State* v. *Hinton*, [227 Conn. 301, 323–24, 630 A.2d 593 (1993)]; see *State* v. *Gonzalez*, supra, 406–407. A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . *State* v. *Hodge*, 248 Conn. 207, 218–24, 726 A.2d 531 (1999)." (Internal quotation marks omitted.) *State* v. *King*, 249 Conn. 645, 657–60, 735 A.2d 267 (1999).

At trial, the defendant characterized each of the four reasons given by the assistant state's attorney as pretextual. The court disagreed after examining each of the reasons and analyzing each under the six *Batson* factors. Once the state sustained its burden of producing a race neutral explanation, the burden of persuasion shifted to the defendant to demonstrate that the state's reasons were insufficient or pretextual. *State* v. *Beltran*, 246 Conn. 268, 280, 717 A.2d 168 (1998). The defendant failed to meet his burden. The record fully supports the court's conclusions that J (1) demonstrated difficulty in accepting the principle that it is the duty of jurors to apply the law as given by the court to the facts as found by them, (2) showed a reluctance to judge others and (3) hesitated in affirming that she could be fair and impartial to both sides. After finding that those race neutral reasons existed, the court concluded that it was unnecessary "to hold a trial in a trial on the question of what happened in the . . . restaurant in Manchester . . . ."

On appeal, the defendant argues that he raised a dual motivation claim at trial "because the dual motivation found in this case is a function of the multiple reasons belatedly claimed by the state when the predominate motivating force for her challenge was the . . . [r]estaurant [incident] . . . [and this] claim was the heart

of the defendant's argument at the *Batson* hearing relative to three 'other' reasons." "[T]he trial court must consider all of the proffered reasons together in determining whether, as a factual matter, the party exercising the peremptory challenge was motivated, in whole or in part, by impermissible discriminatory considerations." *State* v. *Hodge*, supra, 248 Conn. 223–24.[7] If a defendant fails to raise a dual motivation claim, and the trial court never addresses that claim, the record is inadequate for appellate review. Id., 226–27. It is clear from the record that the court neither addressed nor performed a dual motivation claim analysis under *Howard* v. *Senkowski*, 986 F.2d 24 (2d Cir. 1993).[8] It appears from the record that the defendant never raised that claim. Even if we assume arguendo that the defendant did raise the claim, he failed to move for an articulation of the court's *Batson* decision to address a dual motivation claim. We will not review the unpreserved claim.

The defendant further argues that the court should have granted his *Batson* motion or, in the alternative, held an evidentiary hearing relative to the restaurant incident prior to ruling on the motion.

Our review of the record discloses that defense counsel originally agreed with the court's suggestion that an offer of proof could be submitted in lieu of testimony. In any case, however, the defendant cannot sustain his burden of demonstrating on appeal that he was entitled to an evidentiary hearing as a matter of law or that the court abused its discretion in denying such a hearing.

[7] The court rendered judgment in this case prior to the publication of *State* v. *Hodge*, supra, 248 Conn. 207.

[8] "*Batson* challenges may be brought by defendants who can show that racial discrimination was a substantial part of the motivation for a prosecutor's peremptory challenges, leaving to the prosecutor the affirmative defense of showing that the same challenges would have been exercised for race-neutral reasons in the absence of such partially improper motivation." *Howard* v. *Senkowski*, supra, 986 F.2d 30.

The defendant fails to demonstrate that the court's finding in regard to the state's exercise of a peremptory challenge to excuse J was clearly erroneous. Accordingly, the defendant cannot prevail on his claim that the state improperly excused J.

## II

The defendant next claims that the court improperly admitted into evidence certain testimony during redirect examination of an expert witness. We disagree.

The following additional facts are necessary for our resolution of this claim. The state called Robert O'Brien, a forensic criminologist, as its last witness during its case-in-chief. The court designated O'Brien an expert with respect to firearms in regard to distance determination. On direct examination, O'Brien testified that he conducted four tests with the defendant's shotgun and that he analyzed the victim's shirt, which contained a bullet hole. The tests involved firing the gun at a special type of paper from four different distances and collecting data on the types of hole or pattern each bullet made on the paper. O'Brien then compared that data with the bullet hole in the victim's shirt. O'Brien explained the differences he detected in the patterns caused by the gun's being fired at varying distances from the target. O'Brien also testified about the bullet hole in the victim's shirt.

On cross-examination, defense counsel asked O'Brien about his examination of the victim's shirt, the process he used when firing at the paper and the possible differences that could exist when comparing bullet pattern results on the test paper with the bullet hole in the victim's shirt. O'Brien also answered specific questions on cross-examination relating to substances found on the shirt, whether the wadding portion of the shotgun shell separated from the bullet prior to impact and the specific "scalloping" type pattern near the vic-

tim's gunshot wound. Several questions required O'Brien to explain what difference, if any, a change in the distance between the firearm and the target would have on the tests O'Brien performed.

On redirect examination, in the context of the firearm used in this case, the assistant state's attorney asked O'Brien, "Now, specifically, when you were making your determination, based on these four separate ranges, what was your conclusion as to the range that this particular firearm was fired?" Defense counsel objected on the ground that the question was beyond the scope of cross-examination.[9] The assistant state's attorney noted that she sought nothing new or different because defense counsel had asked several questions about the testing O'Brien performed and what it revealed about distance between the firearm and its target. Defense counsel argued that he asked specific questions about experiments O'Brien performed, but he maintained that the assistant state's attorney, on direct examination, never inquired about O'Brien's opinion as to the specific distance at which the firearm was fired in this case. The assistant state's attorney argued that the questions related to distance asked during cross-examination entitled her to ask that question. The court overruled the objection, and the witness testified that he determined that the distance between the muzzle of the shotgun and the victim's shirt was between three feet and six feet.

"The basic purpose of redirect examination is to enable a witness to explain and clarify relevant matters

[9] In support of his objection, defense counsel argued: "I'm not sure what the thrust of this question is, but if the thrust of the question is to ask his opinion regarding, regarding, the range that this weapon was fired at from the, from the, victim, then she had ample opportunity to get to any and all of that on her direct examination of this witness, and I didn't ask any questions along those lines. It's far beyond the scope of direct examination and inappropriate at this time. She had ample opportunity to ask him anything she wanted to as her witness. If that's the intent of the question, I'm not really sure."

in his testimony which have been weakened or obscured by his cross-examination. . . . The scope of redirect examination, however, is limited by the subject matter of cross-examination." (Citations omitted; internal quotation marks omitted.) *State* v. *Jones*, 205 Conn. 638, 666, 534 A.2d 1199 (1987). The court has broad discretion in considering whether to allow redirect examination, and its decision will not be reversed unless it has abused that discretion. Id., 666–67.

In this case, the court properly exercised its discretion in allowing the state to present redirect testimony as to the approximate firing distance because defense counsel opened the door to such evidence. Defense counsel asked O'Brien during cross-examination about gunpowder residue and the results of the tests performed on the victim's shirt relative to gunpowder residue. In response to questions, O'Brien testified that although the shirt contained no visible signs of residue, he found residue in the form of some nitrates and nitrites. He further testified that although he performed no similar tests on the test firing impact points, test firings from the three, four and six foot points produced no visible residue; that the six foot firing test produced evidence of wadding separation; and that the victim's shirt contained no such evidence of wadding separation.

"The litigant who initially elicits testimony on a certain issue is said to have opened the door to rebuttal by the opposing party." (Internal quotation marks omitted.) *State* v. *Jones*, supra, 205 Conn. 666. "Generally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject." *State* v. *Graham*, 200 Conn. 9, 13, 509 A.2d 493 (1986). In determining whether it should allow further inquiry into the subject matter, the court should balance the harm to the state in restricting the inquiry with the

prejudice suffered by the defendant in allowing the rebuttal in the form of redirect. *State* v. *Moore*, 49 Conn. App. 13, 20–21, 713 A.2d 859 (1998).

Applying the foregoing principles to the facts of this case, we conclude that the court did not abuse its discretion. The questions and answers of the witness on cross-examination delved into the approximate distance between the shotgun and the victim, suggesting that it was less than what O'Brien testified to on direct. We conclude that regardless of whether the redirect testimony rebutted or modified answers given on cross-examination, or clarified or reiterated O'Brien's testimony on direct, the court did not abuse its discretion in allowing that evidence.

### III

The defendant also claims that the court improperly denied his motion to strike O'Brien's testimony and improperly allowed the state to open its case-in-chief after resting to admit evidence regarding the victim's shirt.

The following additional facts and procedural history are necessary to our resolution of this claim. After the state rested, the defendant moved to strike O'Brien's testimony, arguing that the state had failed to show that the shirt O'Brien used as a basis for comparison during the various test firings was the shirt worn by the victim on the night of the murder. The state moved to open its case.[10] The court denied the defendant's motion to strike and granted the state's motion to open for the limited purpose of establishing the chain of custody of the shirt. Thereafter, the state called three additional witnesses.

---

[10] The state also argues, in the alternative, that it had introduced sufficient evidence to allow the jury to infer that the shirt used for testing was the one worn by the victim. The state posits that the granting of the state's motion to open served to elaborate or to explain testimony already given.

The defendant argues that he made substantial arguments in support of his motion to strike and in opposition to the state's motion to open. He argues that his motion highlighted the defects in the state's case, and that after the court denied his motion, the state, to his detriment, presented new and not merely cumulative evidence as to the degree of culpability.

The decision to open a criminal case to add further testimony lies within the sound discretion of the court, which "should be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . The purpose . . . is to preserve the fundamental integrity of the trial's truth-finding function." (Internal quotation marks omitted.) *State* v. *Montini*, 52 Conn. App. 682, 687, 730 A.2d 76, cert. denied, 249 Conn. 909, 733 A.2d 227 (1999). Where the state fails to present an essential element of the crime and the defendant specifically identifies the evidentiary gap, it is an abuse of discretion to open the case to supply the missing evidence. *State* v. *Allen*, 205 Conn. 370, 383–84, 533 A.2d 559 (1987).

In the present case, it appears that the state presented a prima facie case, not omitting any essential element of the crime. The court exercised its discretion to allow the state to present additional evidence. We will reverse that discretionary exercise only upon a showing of manifest abuse of discretion or injustice. *State* v. *Dunbar*, 51 Conn. App. 313, 319, 721 A.2d 1229 (1998), cert. denied, 247 Conn. 962, 724 A.2d 1126 (1999). Substantial justice includes fairness to the state as well as to the defendant.

In determining whether the court abused its discretion, we must make every reasonable presumption in favor of its action. *State* v. *Prioleau*, 235 Conn. 274, 304, 664 A.2d 743 (1995). The defendant failed to sustain

his burden of demonstrating that the court abused its discretion in granting the state's motion.

The judgment is affirmed.

In this opinion the other judges concurred.