STATE OF CONNECTICUT *v.* JAMES STRONG
(AC 18951)

Foti, Spear and Healey, Js.

Argued May 4—officially released August 29, 2000

*Donald Dakers,* special public defender, with whom, on the brief, were *Glenn W. Falk,* special public defender, and *Philip K. Houck,* law student intern, for the appellant (defendant).

*Leon F. Dalbec, Jr.,* senior assistant state's attorney, with whom, on the brief, were *Michael Dearington,*

state's attorney, and *Elpedio N. Vitale*, senior assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, James Strong, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a.[1] The defendant claims that the trial court improperly denied his motion to suppress a statement he gave to the police.[2] We affirm the judgment of the trial court.

On the basis of the evidence adduced at trial, the jury reasonably could have found the following facts. On February 21, 1996, at approximately 2:30 p.m., Officer Andrew Faggio of the New Haven police department went to the two story residence of the seventy-two year

---

[1] General Statutes § 53a-54a provides: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a) of this section, on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony or murder under section 53a-54d."

[2] In addition to the charge of murder, the defendant was charged with and found guilty of one count of felony murder in violation of General Statutes § 53a-54c. On September 18, 1998, the court sentenced him to sixty years incarceration for the murder conviction. The judgment file indicates that the felony murder conviction was merged with the murder conviction. At oral argument, counsel for the defendant withdrew, with the permission of the defendant, a second issue wherein the defendant claimed that the sentence imposed by the court violated his right against double jeopardy.

old murder victim, James King, in New Haven. Upon arrival, Faggio observed the deceased victim lying on his back on the living room floor. The victim had blood on his face and clothes, and a woman's coat was tied around his neck. Faggio also observed that the downstairs was in disarray. The victim's empty wallet was found lying on an ottoman in the living room, and credit cards were scattered around the room. The upstairs portion of the residence was in similar condition, and several valuables were missing.[3]

On February 22, 1996, the defendant voluntarily submitted to an interview with the police and, thereafter, gave them a tape-recorded statement that was transcribed and which he signed. The defendant also signed a waiver of rights form.

According to the statement given to the police, the defendant went to the victim's residence at around noon on February 20, 1996, to visit with the victim.[4] During this visit, the defendant learned that his grandmother was in a hospital. The defendant made several telephone calls. In one of those calls, he attempted to borrow some money from an uncle. After about twenty minutes, the defendant departed from the victim's residence and waited for the victim to leave. Thereafter, the defendant returned and gained entrance to the house by breaking a windowpane in the side door, and reaching in and opening the door.

Upon entering the house, the defendant took a videocassette recorder from the downstairs den and left the victim's residence. The defendant later sold the videocassette recorder for $25. Shortly thereafter, the defendant went to a friend's basement apartment and "got

---

[3] Furthermore, the police found the defendant's fingerprints on the exterior windowpane attached to a side door leading to the kitchen, an empty piggy bank and a toiletry box that was on a bed in one of the bedrooms.

[4] The defendant is the step-grandson of the victim.

high." A few hours later, however, the defendant returned to the victim's residence. The broken window-pane was covered with cardboard. The defendant pushed back the cardboard and again gained entrance by reaching in and opening the door. The defendant then proceeded to take approximately $40 in silver dollars and half-dollars from a piggy bank.

According to the defendant, he then heard the victim enter the house. The defendant stated that he ran down the stairs and shoved the victim from behind, causing the victim to be knocked to the floor in the living room next to a china cabinet.[5] The defendant then ran out of the victim's residence.

According to the defendant, he later returned to the victim's house, but received no answer when he knocked on the door. The defendant entered the house and found the victim still lying on the floor in the living room. The defendant stated: "I went over to him and said, 'Grandpa, grandpa.' There wasn't no answer. So, I bent down and I test his heart, I test his chest, and I couldn't tell if his heart was beating or not, so I put my hand to his nose and I didn't feel no breathing. So, I put my hand to his chest and was pumpin' on his chest, and I tried to give him mouth-to-mouth resuscitation and still [there] was no response." The defendant stated that he put a towel over the face of the victim and departed from the residence.

An evidentiary hearing was held on June 19, 1998, on the defendant's motion to suppress his statement. After making the following findings of fact, the court,

---

[5] Ira Kanfer, an associate medical examiner who conducted an autopsy on the victim, concluded that the victim had three separate abrasions on his forehead, three separate hemorrhages on his scalp, a cut over his eye, a bruise on his lower lip and a number of loose teeth that were ready to fall out. According to Kanfer, these injuries were consistent with having endured a fight or struggle and would not likely be caused by a fall.

*O'Keefe, J.,* denied the defendant's motion, stating:[6] "The statements were voluntary and made after a knowing and intelligent waiver . . . . [T]he defendant was, for purposes of this motion alone, was in custody. So, a warning and a waiver were necessary. . . . Detective [John] Bashta, whose testimony I accept, indicated that he got a call while he was proceeding to another location to come back to One Union Avenue, which is the New Haven police department, because the defendant was there. Detective Bashta was not aware how [the defendant] got there, but was informed that he was there and was available for questioning.

"Detective Bashta encountered the defendant sitting in a main conference room, which was not any kind of a confined area. The defendant was not handcuffed. Detective Bashta told the defendant why he was there. There was no evidence of any tricks or any kind of subterfuge used by the police. Detective Bashta indicated that the defendant had no problem with talking with the police and agreed to answer questions.

"State's exhibit number one, for the purposes of the motion to suppress, was a waiver form, which was presented to the defendant. The testimony was that he read it. He signed it. The detective had him read a few lines out loud so that he knew that he could read and write. The waiver form is a standard waiver form, and it includes the appropriate warnings. . . .

"The defendant agreed to talk to the detective and signed the form, and it was dated, and a time was put on it. The interview was on tape. The defendant never indicated that he wanted to leave. He was never told that he could not leave. The detective testified that [the

---

[6] The court did not file a memorandum of decision, but instead transcribed its oral findings, then signed and dated the transcript of those findings. See Practice Book § 4059, now § 64-1.

defendant] appeared to be lucid and . . . there was no indication of any intoxication.

"With regard to that, I have listened to the tape-recorded statement that was taken, and his conversation and speech were clear, lucid and intelligent, clearly related to the questions that were being asked. Further evidence in that regard is that the defendant made some corrections and initialed those corrections when the final transcript was produced a little bit later in the day. Although the defendant may have, at some point during the interview, appeared upset and tearful, that affect is . . . appropriate for the proceedings. There's no evidence of any kind of confusion or thought disorder or anything of that nature . . . . The defendant was familiar with the criminal process, having been informed of his *Miranda*[7] rights on previous occasions.

"The state has satisfied its burden with regard to the proof of waiver, which is proof by a preponderance of the evidence, and I can state for the record that even if the standard had been higher, that the state would have satisfied that in view of the evidence here, beyond any doubt, any reasonable doubt . . . that this was a voluntary, knowing and intelligent waiver. The evidence supporting that, in my view, is substantial."

The sole issue on appeal is whether the court improperly denied the defendant's motion to suppress the statement he gave to the police as a result of the court's conclusion that he had waived his *Miranda* rights voluntarily, knowingly and intelligently. It is well settled that "[t]he state has the burden of proving the voluntariness of [a defendant's] confession by a fair preponderance of the evidence." (Internal quotation marks omitted.) *State* v. *Pinder*, 250 Conn. 385, 418, 736 A.2d 857 (1999); see *Lego* v. *Twomey*, 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972); *State* v. *James*, 237

---

[7] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Conn. 390, 411, 678 A.2d 1338 (1996). Our Supreme Court recently clarified the proper scope of appellate review of a trial court's determination of voluntariness. See *State* v. *Pinder*, supra, 420. "To begin, we note the established rule that [t]he trial court's findings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous. . . . As [is] true concerning appellate review of determinations of custodial interrogation, although we give deference to the trial court concerning these subsidiary factual determinations, such deference is not proper concerning the ultimate legal determination of voluntariness. In its review of state court determinations of voluntariness, the United States Supreme Court long has concluded that the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination. . . . Consistent with the well established approach taken by the United States Supreme Court, we review the voluntariness of a confession independently, based on our own scrupulous examination of the record. The ambiguity apparent in [prior Connecticut Supreme Court] cases is that, while correctly citing to the relevant federal case law for the proposition that we will conduct an independent determination of voluntariness . . . [our Supreme Court also has] continued to state in these same cases that [o]n the ultimate issue of voluntariness . . . we will conduct an independent and scrupulous examination of the entire record *to ascertain whether the trial court's finding is supported by substantial evidence.* . . . [C]ontinued use of the substantial evidence language, when it is inconsistent with the plenary review that we in fact conduct, perpetuates a misstatement of the law. . . . [T]herefore, [the proper scope of review

regarding the] ultimate issue of voluntariness requires us, not to ascertain whether the trial court's finding is supported by substantial evidence, but to conduct a plenary review of the record in order to make an independent determination of voluntariness." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 420–21.

Our scrupulous review of the record reveals that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. The court found Bashta's testimony to be credible. The defendant had the ability to read and write, was not a novice to the criminal justice system and was well aware of his rights when he executed his waiver. It appears from the record that he understood what he was waiving and that he did so voluntarily, without coercion, threats or compulsion by the law enforcement officers. We also conclude that while the defendant may have been upset or distraught when he gave his statement, that was of little consequence to his general emotional state as it affected his decision to waive his *Miranda* rights. We do not credit at all the defendant's claim that he was intoxicated when he executed the waiver. Again, the court credited Bashta's testimony, which obviously showed otherwise. Because the statement was tape-recorded, the court had the advantage of listening to the actual voice of the defendant and found that his "conversation and speech were clear, lucid and intelligent, clearly related to the questions that were being asked." The court concluded, and we agree, that the defendant's claim that he was intoxicated when he gave the statement appears to be inconsistent with his ability to read the twenty-eight page statement, and sign each page and initial the corrections he made. The court properly denied his motion to suppress.

The judgment is affirmed.

In this opinion the other judges concurred.