## STATE OF CONNECTICUT *v.* MICHAEL FINAN
### (AC 21737)

Dranginis, Flynn and Bishop, Js.

---

Argued November 21, 2003—officially released March 30, 2004

[redacted]

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*Lisa A. Riggione*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Warren Maxwell*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The principal issue in this appeal is whether police officers may give lay opinion testimony as to the identification of an individual depicted on a convenience store surveillance videotape filmed during the course of a robbery. Because we believe that they may, the trial court's judgment of conviction is affirmed.

The defendant, Michael Finan, was convicted after a jury trial of one count of robbery in the second degree in violation of General Statutes § 53a-135 and one count of conspiracy to commit robbery in the second degree in violation of General Statutes §§ 53a-135 and 53a-48 (a). On appeal, he claims that the court abused its discretion when it allowed four police officers to testify that they suspected that he was one of the individuals who was depicted on the store's surveillance videotape. The defendant claims, additionally, that he was denied a fair trial due to jury misconduct.

The jury reasonably could have found the following facts relevant to our discussion of the issues on appeal. At approximately 2:50 a.m. on December 23, 1999, the defendant and an unidentified man entered a 7-Eleven convenience store in South Windsor, one behind the other, while clerk Ken Thibeault was working and while the store's surveillance video camera was operating and aimed in the direction of the checkout area. The

defendant was wearing a green hooded sweatshirt, and the unidentified man wore a mask and carried a rifle or shotgun. The videotape showed the unarmed man walking past the checkout area out of the camera's range after which the armed man could be seen stopped at the checkout counter and pointing his weapon at the clerk. Shortly thereafter, the unidentified armed man could be seen walking from the checkout area out of the store, and the defendant also could be seen simultaneously exiting the store. During the subsequent investigation, four South Windsor police officers viewed the videotape of the two men entering and departing from the store, and of the events of the robbery itself involving the unidentified man. At trial, each of the officers testified about having a suspicion based on a long-term familiarity with the defendant's profile and mannerisms that the unarmed man depicted entering and departing from the store simultaneously with the armed man was the defendant. That evidence was heard by the jury over the defendant's objection that the officers' testimony should be precluded on the ground that it invaded the province of the jury to determine the ultimate issue in the case.

On October 30, 2000, the jury found the defendant guilty of robbery in the second degree and conspiracy to commit robbery in the second degree. On December 12, 2000, the court found the defendant in violation of his probation and on February 13, 2001, sentenced him to a total effective term of sixteen years incarceration, suspended after seven years, and five years probation. This appeal followed. Additional facts will be set forth as necessary.

I

The first issue on appeal is whether the court abused its discretion in allowing four police officers to testify that they "suspected" that it was the defendant on the

surveillance videotape. Although we conclude that the court's determination to permit the officers to give identification testimony in the guise of a suspicion, in reliance on *State* v. *Fuller*, 56 Conn. App. 592, 621, 744 A.2d 931, cert. denied, 252 Conn. 949, 748 A.2d 298, cert. denied, 531 U.S. 911, 121 S. Ct. 262, 148 L. Ed. 2d 190 (2000), was misplaced, we nonetheless affirm the decision on the alternate ground that the officers' testimony was appropriate lay opinion as to identification, a material but not ultimate issue.[1]

The following additional facts are germane to our resolution of that issue. Prior to the start of the trial, the defendant filed a motion to preclude testimony by four police officers as to their opinion that he was depicted on the videotape. The defendant argued that the officers' testimony that he was the unmasked individual on the videotape was an opinion on an ultimate issue, which is prohibited by *State* v. *Heinz*, 193 Conn. 612, 627, 480 A.2d 452 (1984), and § 7-3 of the Connecticut Code of Evidence. In response, the state proffered that the officers would not testify as to their opinion, but rather as to their suspicion that the defendant was depicted on the videotape. The state argued that the testimony was admissible under this court's holding in *State* v. *Fuller*, supra, 56 Conn. App. 592. Although the court granted the motion in limine, the court stated that the officers would be permitted to testify in that regard as long as their testimony was limited to their suspicions that the defendant was depicted on the videotape.

Subsequently, the four officers testified at trial that after viewing the surveillance videotape, they suspected that the unmasked man on the videotape was the defendant. Detective Michael Thompson testified that he had

[1] We note that "[w]here the trial court reaches a correct decision but on [mistaken] grounds, this court has repeatedly sustained the trial court's action if proper grounds exist to support it." (Internal quotation marks omitted.) *State* v. *DeLoreto*, 265 Conn. 145, 153, 827 A.2d 671 (2003).

known the defendant for ten years, had watched him grow up and knew his family. He stated that his suspicions were based on the defendant's mannerisms and shy walk. Detective Michael Russotto testified that he knew the defendant and his family for eight to ten years and suspected that the defendant was the unmasked man on the videotape. He claimed that he recognized the defendant from his profile. Officer Kristina Ferrante testified that she had known the defendant for eight years and suspected that he was the man on the videotape on the basis of his mannerisms, specifically his profile and walk. Finally, Officer Daniel Martin testified that upon reviewing the videotape, he immediately suspected that the defendant was the unmasked man on the basis of his sixteen years of contact with the defendant and, in particular, the defendant's distinct walk. In addition to the police officers' identification testimony, the state offered testimony from Robert Teachman, who stated that the defendant had told him that he had participated in the robbery. With those additional facts as context, we turn to the defendant's first claim.

A

The defendant first argues that the testimony of the officers was an opinion on an ultimate issue. That claim has two parts: First, that the testimony of the officers was, in fact, opinion testimony, and, second, that it was testimony on an ultimate issue.

Our standard of review is well settled. "The admissibility of opinion testimony from lay witnesses rests in the sound discretion of the trial court, and the exercise of that discretion, unless abused, will not constitute reversible error." (Internal quotation marks omitted.) *Mezes* v. *Mead*, 48 Conn. App. 323, 330, 709 A.2d 597 (1998).

At the outset, we agree with the defendant that the officers' testimony, though varnished as mere suspicion, was, in fact, opinion evidence. In reaching that determination, we decline to expand the holding in *State* v. *Fuller*, supra, 56 Conn. App. 592, to permit lay identification opinion testimony when couched as a mere suspicion if that same testimony framed as an opinion would otherwise be inadmissible. In *Fuller*, we found no error in the trial court's ruling permitting the defendant's father to testify that he suspected that his daughter had committed the charged criminal act. As we noted in *Fuller*, however, the evidence was admitted as part of the state's redirect examination of the defendant's father and as part of an effort to rehabilitate him after vigorous cross-examination by the defendant bearing on her father's state of mind during the evening of the assault. Id., 619. Those limitations, which were an integral part of our holding in *Fuller*, are not present in this instance. Here, unlike in *Fuller*, the testimony of the officers, while characterized as suspicion, can be understood fairly only as statements of the opinion that it was the defendant who was depicted on the surveillance videotape.

Our conclusion that the officers' testimony was, in fact, opinion evidence brings us to the consideration of whether that testimony was admissible as a lay opinion. At the outset, we note that in Connecticut, under prescribed circumstances, a lay witness may be competent to offer an opinion. Connecticut Code of Evidence § 7-1 provides: "If a witness is not testifying as an expert, the witness may not testify in the form of an opinion, unless the opinion is rationally based on the perception of the witness and is helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue." Thus, to be admissible, lay opinion testimony must meet two criteria: It must rationally be based on perception, and it must be helpful. In this

instance, our review of the record finds support for both parts of the test. Each of the officers had significant contacts with the defendant for periods ranging from eight to sixteen years and in various circumstances. On the basis of their knowledge of the defendant, the officers were able to offer testimony concerning his mannerisms, gait, and profile and identifying similarities on the videotape. Thus, the officers' familiarity with the defendant provided them a rational basis for their testimony that it was the defendant who appeared as the unarmed person on the surveillance videotape.

As to the second criteria for admissibility, regarding helpfulness, the defendant argues that the jurors were just as able as the officers to determine whether the videotape depicted the defendant. Specifically, he argues that the jury had the opportunity to observe the defendant, his mannerisms and his stance in the courtroom and, therefore, could compare the person on the videotape to the defendant and reach a conclusion without the officers' testimony. We disagree. We believe that testimony by individuals who knew the defendant for a number of years and in a variety of circumstances offered to the jury a perspective it could not have acquired in its limited exposure to the defendant during the trial. Our conclusion is buttressed by the fact that the depiction of the defendant on the videotape was momentary and not particularly clear. The record reflects that on the videotape, the defendant was seen wearing a sweatshirt with a hood pulled over his head so that his face was partially obscured. The videotape also showed the defendant from his profile, thus further obscuring his face. Additionally, the entire robbery lasted about two minutes, and the defendant could be seen only briefly at the beginning and end of the videotape. Given the limited view of the defendant afforded by the videotape, we conclude that the testimony of

witnesses familiar with him was helpful to the jury's identification of the individual on the videotape.

Our holding that the testimony was admitted properly is buttressed by federal decisional law applying Federal Rule of Evidence 701, which is identical to Connecticut Code of Evidence § 7-1.[2] As stated by the District of Columbia Court of Appeals, "[t]he majority of jurisdictions that have decided cases involving lay witness testimony identifying a person in a videotape . . . have affirmed the admission of such testimony under [rule] 701 . . . provided that the witness has at least some degree of familiarity with the person identified." *Sanders* v. *United States*, 809 A.2d 584, 594 (D.C. App. 2002), cert. denied, 538 U.S. 937, 123 S. Ct. 1602, 155 L. Ed. 2d 340 (2003). The rule that has emerged from federal courts applying rule 701 is that lay opinions are admissible as to the identity of an individual in a videotape or photograph as long as there is some basis to conclude that the witness is more likely to identify the defendant correctly from the videotape. See, e.g., *United States* v. *Henderson*, 68 F.3d 323, 326–27 (9th Cir. 1995); *United States* v. *Jackman*, 48 F.3d 1, 4–5 (1st Cir. 1995); *United States* v. *Farnsworth*, 729 F.2d 1158, 1160 (8th Cir. 1984).

The determination that the opinion testimony of a lay witness is reasonably based on perception and helpful to the fact finder does not, however, end the inquiry because the proscription against opinion testimony on an ultimate issue pertains to both expert and lay opinion. As the defendant correctly asserts, "[n]o witness, lay or expert, may testify to his opinion as to the guilt of a defendant, whether by direct statement or inference."

---

[2] When a state rule is similar to a federal rule, we review the federal case law to assist our interpretation of our rule. *Arduini* v. *Automobile Ins. Co. of Hartford, Connecticut,* 23 Conn. App. 585, 589, 583 A.2d 152 (1990). In this case, the language of § 7-1 of the Connecticut Code of Evidence is identical to that of rule 701 of the Federal Rules of Evidence.

(Internal quotation marks omitted.) *State* v. *Fuller*, supra, 56 Conn. App. 619. The more general rule against opinion testimony on an ultimate issue is embodied in Connecticut Code of Evidence § 7-3 (a), which provides: "Testimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact, except that, other than provided by subsection (b), an expert witness may give an opinion that embraces an ultimate issue where the trier of fact needs expert assistance in deciding the issue."

The question, therefore, is whether the officers' opinion testimony concerning the identification of the defendant on the videotape constituted prohibited lay opinion on an ultimate issue. Although the term "ultimate issue" is often found in our decisional law, it is not amenable to easy definition. We find help in the Ballentine's Law Dictionary definition of the allied term "ultimate fact" as "[a] fact upon the existence or nonexistence of which liability is to be determined. . . . The final and resulting fact reached by processes of legal reasoning from the detailed or probative facts, as distinguished from evidentiary facts and conclusions of law. . . ." Ballentine's Law Dictionary (3d Ed. 1969). Thus, the idea of an ultimate issue or fact is that it is interwoven with the core of the fact to be proven or elemental to it. For example, in a criminal case, while the ultimate issue is whether the defendant is guilty, there may be other issues so interwoven with the question of guilt that they can not reasonably be separated. For example, we have found "voluntariness" to be an ultimate issue on the admission of a confession; *State* v. *Strong*, 59 Conn. App. 620, 627, 757 A.2d 1186 (2000); "intent" an ultimate issue in a charge of selling a controlled substance; *State* v. *Bradley*, 60 Conn. App. 534, 545–46, 760 A.2d 520, cert. denied, 255 Conn. 921, 763 A.2d 1042 (2000); and "discriminatory intent" an ultimate issue on review of the court's response to a challenge under

*Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), regarding the use of peremptory challenges during jury selection; *State* v. *Meikle*, 60 Conn. App. 802, 811, 761 A.2d 247, cert. denied, 255 Conn. 947, 769 A.2d 63 (2000). In each of those instances, the issue we found to be ultimate could not reasonably be separated from the essence of the matter to be decided.

Moreover, while we agree with the defendant that in any case there may be more than one ultimate issue, we do not believe that every fact that is material to guilt is, for that reason alone, an ultimate issue. Identification is often such an issue. Here, the identity of the individual on the videotape, while clearly material, was not so interwoven with the state's charge that the positive identification of the defendant as the unarmed man on the videotape proved his participation in the crime. As noted, the videotape depicted two men entering the convenience store, one before the other. One individual, identified by the police witnesses as the defendant, could be seen entering the store and then leaving the video camera's view. The second person, who appeared to be carrying a rifle or shotgun, then appeared to aim the weapon at the store clerk in the checkout area. We next were able to see the individual identified as the defendant walking out of the store behind the unidentified individual. Although the identification of the unarmed person as the defendant was material to his participation in the robbery, his presence in the store simultaneously with the armed person was not, alone, sufficient evidence of his guilt.

Our view of lay opinion identification testimony as properly admissible is not novel. In *State* v. *Gagnon*, 18 Conn. App. 694, 561 A.2d 129, cert. denied, 213 Conn. 805, 567 A.2d 835 (1989), noting that lay opinion properly may be admitted on the issue of the identity or similarity of persons, this court, on the ground that the

testimony of a police officer was relevant and admissible, affirmed the decision of the trial court to permit the officer to render an opinion that a composite sketch drawn from the victim's description of her assailant resembled the defendant. Id., 713–14.

Because the officers were familiar with the defendant and their testimony was helpful to the jury in determining a fact material to the state's case, we conclude that although it was couched in terms of "suspicion," the officers' testimony was admissible lay opinion. Accordingly, the court did not abuse its discretion in admitting the officers' identification testimony.[3]

## B

Finally, as to this issue, the defendant argues that if the police officers' testimony was admissible as lay opinion, the testimony should nevertheless have been excluded because its probative value was outweighed by its prejudicial effect. Specifically, he argues that in light of the "weak case" presented by the state, the jury likely gave the opinions by the officers undue weight. We disagree.

As a general rule, "[a]lthough relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value." (Internal quotation marks omitted.) State v. Talton, 63 Conn. App. 851, 857, 779 A.2d 166, cert. denied, 258 Conn. 907, 782 A.2d 1250 (2001). Although the defendant argues on appeal that the state's case was weak, the relative strength of the state's case

[3] The defendant argues that the court erred by not making a specific finding that the testimony of the officers was helpful within the meaning of § 7-1 of the Connecticut Code of Evidence. We disagree. Although the court's ruling on the motion in limine did not use the specific word "helpful," the record reveals that the court indicated that the videotape was brief and hard to see. Furthermore, a finding of helpfulness is implicit in the court's decision to allow the officers to testify.

is not the proper standard to determine whether the probative value of admissible evidence is outweighed by its prejudicial effect. "The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury." (Internal quotation marks omitted.) Id.

An examination of the record reveals that the officers' testimony was factual and not emotionally laden. All of the officers testified that they knew the defendant and his family from the community. There was no indication by the officers that the defendant had been arrested or that they had any interaction with him in any official capacity. Furthermore, the defendant's claim of prejudice is belied by the court's instructions to the jury. In its charge, the court made clear that testimony should not be given special consideration simply because it was from a police officer. On the basis of the foregoing, we are unpersuaded that the probative value of the officers' testimony was outweighed by its prejudicial impact on the defendant.

## II

The defendant next argues that he was denied his federal and state constitutional rights to a fair and impartial jury due to four instances of alleged jury misconduct. Specifically, the defendant alleges misconduct in that the jury foreman failed to disclose that he was familiar with the state's inspector; jurors were improperly influenced by the presence, during trial, of spectators friendly to the defendant; the court improperly failed to place the jury foreman under oath during the court's hearing into the alleged misconduct; and, finally, the court's questioning of the jurors improperly invaded their deliberative process. We disagree. We consider the issues in turn.

The following additional facts are germane to our discussion of the first issue. At the conclusion of the trial and prior to sentencing, the state became aware that an inspector working for the state, Madison Bolden, knew the jury foreman, L. The state brought that to the attention of the defendant and the court. The defendant subsequently filed a motion for a new trial, alleging that he was deprived a fair trial due to that alleged misconduct.

On November 8, 2000, the court conducted an evidentiary hearing on the allegations of jury misconduct. At the outset, the state disclosed that the original inspector assigned to the case had been unable to work on it and that Bolden had been substituted after jury selection was completed. The court then questioned L, who testified that he was friendly with Bolden's father and knew Bolden as well. He maintained that during the trial, he had not realized that Bolden worked for the state's attorney's office and that his knowledge of Bolden had not affected his ability to be impartial.

On February 14, 2000, the court denied the defendant's motion for a new trial. The court determined that contrary to the defendant's claim, L had not concealed his relationship with Bolden, as he never had been instructed that he had a continuing obligation to inform the court if he recognized any participants in the trial. Accordingly, the court found that there was no misconduct by L and no prejudice attributable to the conduct of L.

Before assessing the claim, we first set forth the principles that guide our review. "To ensure that the jury will decide the case free from external influences that might interfere with the exercise of deliberate and unbiased judgment . . . a trial court is required to conduct a preliminary inquiry, on the record, whenever it is presented with information tending to indicate the pos-

sibility of juror misconduct or partiality." (Citation omitted; internal quotation marks omitted.) *State* v. *Mukhtaar*, 253 Conn. 280, 296, 750 A.2d 1059 (2000).

"[A] trial court should consider the following factors in exercising its discretion as to the form and scope of a preliminary inquiry into allegations of jury misconduct: (1) the criminal defendant's substantial interest in his constitutional right to a trial before an impartial jury; (2) the risk of deprivation of the defendant's constitutional right to a trial before an impartial jury, which will vary with the seriousness and the credibility of the allegations of jury misconduct; and (3) the state's interests of, inter alia, jury impartiality, protecting jurors' privacy and maintaining public confidence in the jury system. . . .

"Consequently, the trial court has wide latitude in fashioning the proper response to allegations of juror bias. . . . We [therefore] have limited our role, on appeal, to a consideration of whether the trial court's review of alleged jury misconduct can fairly be characterized as an abuse of its discretion. . . . [W]hen, as in this case, the trial court is in no way responsible for the alleged juror misconduct, the defendant bears the burden of proving that the misconduct actually occurred and resulted in actual prejudice." (Internal quotation marks omitted.) *State* v. *Bangulescu*, 80 Conn. App. 26, 49–50, 832 A.2d 1187, cert. denied, 267 Conn. 907, 840 A.2d 1171 (2003). With those principles in mind, we turn to the defendant's claims.

A

The defendant first argues that the fact that the jury foreman knew the state's inspector and did not disclose that relationship tainted the verdict. We do not agree.

The court's conclusion that there was no misconduct was supported by the record. At voir dire, the jury was

read a list of trial participants, and jurors were asked if they knew any of them. At no time was Bolden's name read to the jury nor were the jurors told that they had to inform the court if they recognized other individuals as the trial progressed. Therefore, the fact that the juror who recognized Bolden did not report the recognition to the court did not violate any rule or norm of juror conduct. Having made proper inquiry into the claim, the court reached factual conclusions that were not clearly erroneous. The court did not abuse its discretion by denying the motion for a new trial.

### B

The defendant next argues that the court abused its discretion when it denied his amended motion for a new trial, which was based on alleged additional jury misconduct. Specifically, the defendant argues that the jurors were biased against him because they were afraid of his family and friends who attended the trial. The following additional facts are relevant to our discussion of that claim.

After the verdict was announced, it came to the attention of the court that several jurors had expressed concerns to the clerk of the court about their physical safety relative to their departing the courthouse. Given that information, the court conducted another evidentiary hearing during which the remaining five jurors were examined. At the hearing, the court took judicial notice of the fact that the courtroom was small and that a group of people friendly to the defendant had attended the trial daily. While expressing some concern about that group of people, all of the jurors indicated that their feelings did not influence their impartiality. From the testimony of the jurors, it became apparent that some of them had expressed concerns in the jury room about the spectators, and some of the jurors indicated that juror A had been especially concerned about

the spectators. When questioned, however, A denied making any comments about the spectators to the other jurors. Nevertheless, A testified that one of the jurors had expressed concerns about leaving the building after the verdict and stated that she shared that concern a little bit. The court concluded that although some members of the jury expressed discomfort and nervousness as a result of the stares of the visitors, those communications did not affect the impartiality of any of the jurors. Accordingly, the court denied the motion.

The defendant makes two arguments in support of his claim that the court should have granted him a new trial due to jury misconduct. First, he argues that a new trial was warranted because one of the jurors, A, was dishonest when questioned. We do not agree.

"It is well established that [i]n a [hearing] before a court, the trial judge is the sole arbiter of the credibility of the witnesses . . . and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible. . . . On appeal, we do not retry the facts or pass on the credibility of witnesses." (Internal quotation marks omitted.) *Dubreuil* v. *Witt*, 80 Conn. App. 410, 417, 835 A.2d 477 (2003). Despite the defendant's assertions that A was not truthful, the court, as the sole arbiter of credibility, was permitted to accept A's testimony and, therefore, a new trial was not warranted on that ground.

The defendant's second argument related to that issue is that the court wrongly relied on the jurors' assertions that the spectators did not affect their impartiality. Specifically, the defendant argues that the court should have recognized the prejudicial overtones that flowed from the fact that the jurors were afraid of the defendant's family and friends.

At the outset, we note that the defendant's argument is merely speculative. The record is devoid of any fac-

tual basis from which the court reasonably could have determined that the presence of people friendly to the defendant had any impact—beneficial or detrimental—on the defendant during trial. Furthermore, the court conducted a thorough examination of the jurors to determine if any alleged misconduct did occur, and the defendant's counsel was given a full opportunity to question the jurors as well. The court fulfilled its obligation to investigate the alleged misconduct. In that light and mindful of the absence in the record of any evidence of juror misconduct, we cannot conclude that the court abused its discretion in denying the defendant's motion.

C

The defendant also argues that the court erred at the evidentiary hearing by asking the jurors if the presence of the spectators during trial had affected their ability to be fair and impartial. Specifically, he claims that the question violated Practice Book § 42-33. We disagree.

Practice Book § 42-33 provides in relevant part that "[u]pon inquiry into the validity of a verdict, no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror nor any evidence concerning mental processes by which the verdict was determined. . . ." Contrary to the defendant's assertion, the question posed by the court did not seek to inquire into how the verdict was determined. Rather, the court sought to determine whether the jury had been affected by the spectators. Concerning inquiry into alleged juror misconduct, our Supreme Court has consistently supported the trial court's right to permit questioning as to whether a juror would be able to be fair and impartial in light of a specific fact. See *State* v. *Cubano*, 203 Conn. 81, 92, 523 A.2d 495 (1987) (not improper for court to ask if juror's ability to determine defendant's guilt or innocence affected by knowledge that juror's friend might be defendant's friend); see also

*State* v. *Tomasko*, 242 Conn. 505, 513 n.12, 700 A.2d 28 (1997) (not improper to ask juror if decision to convict based on confusion over jury instruction); *State* v. *Newsome*, 238 Conn. 588, 631, 682 A.2d 972 (1996) (trial court's factual determination relative to jurors' testimony about alleged misconduct entitled to substantial weight). The fact that the court asked a similar question after the verdict was no more invasive of the jury's deliberative process. Accordingly, because the questioning by the court was proper, the defendant's claim must fail.

## D

Next, the defendant argues that the court abused its discretion by not having the juror, L, sworn before testifying. We find that claim to be without merit. As noted, once the court was informed of a possible relationship between L and Bolden, the court summoned L to the courtroom. At the beginning of L's testimony, the court informed him that he was still under the juror's obligation to tell the truth and to uphold the law. Although it would have been desirable for the court to have placed L under oath, it is reasonable to believe that L responded to the court under the burden of his duty as a juror because the court prefaced its questions to L with the admonition that he remained under an obligation to be truthful. Under those circumstances, there is nothing in the record to indicate that L's testimony was untrustworthy. Accordingly, the court did not abuse its discretion in relying on L's testimony. Finally, the court's determination that there was no juror misconduct on L's part was not based solely on L's testimony, but on the entire record, which included additional information from which the court reasonably could determine that L had not been tainted by any alleged familiarity with Bolden. Therefore, even if the court incorrectly failed to place L under oath before questioning him, that misstep was harmless.

E

Last, the defendant argues that the court's inquiry into the alleged jury misconduct was inadequate because the court failed to question the two alternate jurors in accordance with the defendant's request. Specifically, the defendant argues that the alternates could have provided additional information about the extent to which the presence of spectators may have affected the jury. We do not agree.

The following additional facts are germane to our resolution of the defendant's claim. During the evidentiary hearing on the defendant's amended motion for a new trial, the defendant requested that the two alternates be called for questioning. In response, the court determined that it was unnecessary to question the alternates, as they were not involved with the deliberations.

It is a well established principle that the form and scope of the inquiry into jury misconduct rests within the sound discretion of the court. We will find an abuse of discretion only "in the highly unusual case in which such an abuse has occurred." (Internal quotation marks omitted.) *State* v. *Bangulescu*, supra, 80 Conn. App. 50. In this case, the court properly conducted an inquiry and questioned all the jurors except the alternates. From its questioning, the court was satisfied that it had sufficient information to render judgment. Upon review of the record and in light of our deferential standard of review, we do not conclude that the court abused its discretion in refusing to question the alternates. Accordingly, that claim, too, must fail.

The judgment is affirmed.

In this opinion DRANGINIS, J., concurred.

FLYNN, J., dissenting. I concur with part II of the majority opinion. I respectfully dissent from part I. I

believe that the principal issue to be decided in this case is whether our traditional common-law rule, embodied in Connecticut Code of Evidence § 7-3, prohibiting opinion evidence about an ultimate issue to be decided by the jury should be abandoned to permit such opinions couched as suspicions as to the identity of the defendant from four police officers, none of whom witnessed the robbery at issue in this appeal. I would hold that the officers' identity testimony constituted opinions on an ultimate issue. First, it went beyond testimony as to factual observations of similarities between the defendant and a person shown on a videotape of the robbery. Second, the effect of the officers' testimony on the issue, if accepted by the jury, was decisive of the defendant's guilt. Third, the fact-finding province of the jury was invaded. I would therefore reverse the conviction and order a new trial.

As is all too common in these times, this prosecution arose because two men robbed a convenience store, one armed and wearing a grotesque Halloween mask and the other wearing a hooded jacket that obscured most of his face. Although the state was not relieved of its burden to prove that a larceny had occurred by force or threat of force, thus constituting a robbery in which one robber was aided by another physically present, there was no contest that the store clerk forcibly had been robbed of the money in his cash register. The only real issue to be determined by the jury was whether the defendant, and not some other person, was one of the two who had committed the robbery.[1] In that sense, it was an ultimate issue. See *State* v. *Coltherst*, 263 Conn. 478, 507, 820 A.2d 1024 (2003)

---

[1] When the identification of the perpetrator of a crime is at issue, it is the state's burden to prove beyond a reasonable doubt "not only that the offense was committed as alleged in the information, but that the defendant was the person who committed it." See D. Borden & L. Orland, 5 Connecticut Practice Series, Criminal Jury Instructions (3d Ed. 2001) § 3.14, p. 238.

(whether defendant's alibi was fabrication was ultimate issue to be determined by jury).

The testimony of the convenience store clerk who had been robbed was not particularly helpful on the identification issue. The robbery took place in less than one minute. The clerk was not able to make an identification of either robber for the police. Cross-examination established that the clerk had not identified the robbers in the written statement he gave to the police on the day of the robbery. The defendant was a regular customer of the store. It was only after the police had arrested the defendant that the clerk claimed to have recognized him as one of the perpetrators. That recognition occurred about six weeks after the robbery when the defendant entered the store to buy a pack of cigarettes. However, the clerk never contacted the police to let them know that the defendant was the robber. The clerk was permitted to make an in-court identification of the defendant. At the time he testified at trial, the clerk had not been shown the video surveillance tape that showed a portion of the robbery.

The defendant objected to the state's calling four members of the police department that had arrested the defendant and who actually had not witnessed the robbery to offer their opinions as to the identity of the hooded person on the videotape. The court was reluctant to permit this testimony given the prejudicial aspect of it and the ultimate issue rule. It was finally persuaded by the state to permit each officer to testify about his or her suspicion as to the identity of the hooded robber on the basis of *State* v. *Fuller*, 56 Conn. App. 592, 744 A.2d 931, cert. denied, 252 Conn. 949, 748 A.2d 298, cert. denied, 531 U.S. 911, 121 S. Ct. 262, 148 L. Ed. 2d 190 (2000). On appeal, the state has abandoned the very *Fuller* claim it urged at trial, namely, that the actual testimony of the officers was admissible as suspicion testimony. Rather, it now claims that each officer's

testimony was an admissible lay opinion and is admissible on that ground. I agree with the majority that the holding in *Fuller* cannot be extended to justify admissibility in this case.

Mere suspicion does not even suffice to meet the lesser standard required for establishment of probable cause. *In re Michael B.*, 36 Conn. App. 364, 371, 650 A.2d 1251 (1994). "The quantum of evidence necessary to establish probable cause exceeds mere suspicion . . . ." (Internal quotation marks omitted.) *State* v. *Guess*, 44 Conn. App. 790, 794, 692 A.2d 849 (1997), aff'd, 244 Conn. 761, 715 A.2d 643 (1998). When the state's case at best raises suspicion of commission of a crime, this is far from establishing its burden beyond a reasonable doubt. It is the law of this state that a person shall not be convicted on mere suspicion. *State* v. *DeCoster*, 147 Conn. 502, 505, 162 A.2d 704 (1960).

The defendant claims that it was improper for the court to have allowed four police officers to testify as to their suspicions that the person in the surveillance videotape was the defendant. The defendant first raised this claim by way of a motion in limine in which he sought an order prohibiting the testimony of any witness about his or her opinion as to the guilt of the defendant, whether by direct statement or inference. The defendant, in his motion, argued that "several police officers will attempt to identify the [d]efendant, by way of [videotape], as being one of the perpetrators of the instant offense and by so doing such testimony would constitute opinion testimony as to the guilt of the [d]efendant and such testimony should be precluded based on [*State* v. *Heinz*, 193 Conn. 612, 480 A.2d 452 (1984)]."

Section 7-3 (a) of the Connecticut Code of Evidence provides: "Testimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided

by the trier of fact, except that . . . an expert witness may give an opinion that embraces an ultimate issue where the trier of fact needs expert assistance in deciding the issue." The state, apparently recognizing the potential obstacle created by § 7-3 of the Code of Evidence and common-law prohibitions on opinion testimony on the ultimate issue; see *State* v. *Heinz*, supra, 193 Conn. 627–28; argued that it planned to ask each police officer if he or she had viewed the videotape and "suspected" who that person was. Although the court granted the defendant's motion to exclude opinion testimony, it allowed the police officers to testify that they "suspected" that the defendant was the man in the hooded sweatshirt. The court reasoned, in reliance on *State* v. *Fuller*, supra, 56 Conn. App. 592, that the police officers' testimony would not amount to opinions on the ultimate issue because such testimony would be couched in the language of suspicion rather than belief.[2]

Four police officers, Michael Thompson, Michael Russotto, Daniel Martin and Kristina Ferrante, testified that they had viewed the videotape at the police station shortly after the robbery and suspected that the man in the hooded sweatshirt was the defendant.[3] Each of these officers testified that he or she knew the defendant personally. There was no mention that they also might have known the defendant from any interactions in their official capacity as law enforcement personnel.

---

[2] The court commented that, prior to having read *State* v. *Fuller*, supra, 56 Conn. App. 592, its inclination was to deny the admissibility of even the testimony as phrased in the form of a suspicion, because the court "felt that anything that's in the nature of suspicion carries little weight."

[3] Beyond merely viewing the videotape, Thompson was the officer in charge of the investigation into the robbery. Russotto assisted the investigation by looking for the gun that was used in the robbery and by taking the statement of the customer who was in the store at the time of the robbery. Martin and Ferrante testified that they had assisted the investigation, but it is not clear from the limited testimony that they gave whether their assistance extended beyond viewing the videotape and corroborating Thompson's and Russotto's suspicions.

For example, Thompson testified that he had known the defendant for approximately ten years, since the defendant was a child. He knew the defendant's family, and the defendant had even been to his house in the past. Ferrante testified that she had known the defendant for seven or eight years and that she had taught him a course when he was in the sixth grade.

The defendant argues that the four officers "inappropriately gave their opinions that [the] defendant was guilty of robbery, a determination that was solely within the jury's province," by testifying that they suspected that he was the man in the hooded sweatshirt. He also contends that the court abused its discretion when it allowed the four police officers to give an opinion on the ultimate issue of the perpetrator's identity because the effect of such testimony, as the state now concedes on appeal, violated the court's order pursuant to the defendant's motion in limine.

The defendant's challenge to the admission of this testimony is evidentiary in nature. "Evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *State* v. *Alvarez*, 216 Conn. 301, 306, 579 A.2d 515 (1990).

The state was able to persuade the court to admit the officers' testimony only by arguing that the testimony would be phrased in the form of suspicion rather than opinion. The state now argues on appeal that a witness may offer an opinion on the issue of identity, effectually conceding that the officer's "suspicions" in fact amounted to opinion testimony.[4] The change in the

---

[4] The defendant, in his initial brief, describes the distinctions between the present case and *State* v. *Fuller*, supra, 56 Conn. App. 592. The state, in response, argues that the distinctions between this case and *Fuller* are irrelevant and that the holding of *Fuller* is not dispositive of the issue of whether the officers' testimony was admissible. The state does not attempt to argue that the officers' testimony involved mere suspicions rather than

state's position in this regard is troubling. At trial, the state persuaded the court that it was excluding opinion testimony on the issue of identity when, in fact, the state was using the officers' testimony for that very purpose. Regardless of the state's strategy in offering the officers' testimony in the form of a suspicion rather than a belief, however, it is clear from the testimony that if it were in fact opinion testimony, as such, it violated the court's order made pursuant to the defendant's motion in limine.

"Whether a statement of a witness is one of fact or of conclusion or opinion within the rule excluding opinion evidence is to be determined by the substance of the statement rather than its form. The use of phraseology appropriate to the expression of an inference, such as believe, think, etc., may in fact signify an opinion which renders the statement inadmissible; but the use of such terms is not conclusive that the witness is stating his opinion, for the language may be used merely to indicate that he is not speaking with entire certainty, in which case the evidence may be received for what it is worth." (Internal quotation marks omitted.) *State* v. *Fuller,* supra, 56 Conn. App. 620.

The present case is factually distinguishable from *Fuller.* The portion of the *Fuller* decision on which the state relied in its argument to the court contained a description of the manner in which the "suspicion" testimony was admitted. See id., 617–19. *Fuller* involved a defendant who was accused of attempting to murder two of her neighbors by discharging a firearm into the front of the neighbors' house in the middle of the night. Harvey Fuller, father of the defendant, Jancis L. Fuller, testified on the depth and length of the defendant's

opinions. The state also cites to several cases for the proposition that opinion testimony is admissible in certain circumstances. The state's position on appeal is diametrically opposite to that taken before the trial judge.

hostility toward the neighbors. On cross-examination, Harvey Fuller testified that he had overheard his daughter try to enlist two men the night before the shooting to go to the victims' home and "try to shake them up and get them to leave her alone. . . ." (Internal quotation marks omitted.) Id., 619. On recross-examination, he testified that the morning after the shooting was one of the worst days of his life. When the state explored this testimony on redirect examination, Fuller testified that he learned of the shooting the morning after it occurred when he awoke to find police cars at his home. It was at this point, in response to the state's question, that he said he suspected that his daughter was responsible for the shooting when he first learned of it. Id. There was then a context and an explanation for this evidence in *Fuller* that explained prior testimony of the witness. In fact, the court noted that it was the defense that had opened the door to this testimony. Id., 621.

In contrast, in the present case, the officers' suspicions were expressed during the state's direct examination and were not offered "to explain and clarify relevant matters in [their] testimony which [may] have been weakened or obscured by . . . cross-examination." (Internal quotation marks omitted.) Id. Furthermore, Harvey Fuller was not one of four police officers who were members of the very police department that had arrested and brought about the prosecution of the defendant. The present case, beyond being factually distinguishable from *Fuller*, does not present a situation in which the jury was exposed to a witness' mere "suspicions." The state asked virtually the same question of all four police officers. That question was whether, after having viewed the videotape, the officer suspected that he or she knew who the unmasked robber was. When the officer responded in the affirmative, the prosecutor would ask who the officer suspected that person was, and the officers each responded with the defendant's

name. This testimony went far beyond the speculation of the witness in *Fuller* who was allowed to testify that, when he heard about the crime that had occurred, he could not help but suspect that his daughter had committed the act. Id., 617 n.27. Our description of the effect of the "suspicion" testimony in *Fuller* illuminates the distinction between its use in that case and the use of the officers' testimony in the present case. "It seems fair to say that when a person only *suspects* that a fact exists, here, that the defendant was the shooter, that person is doing nothing more than recognizing a 'possibility' of the existence of that fact, but he has not concluded that it actually exists. It therefore cannot be said to be an opinion on the ultimate issue before the jury, i.e., guilt or innocence." (Emphasis in original.) Id., 621.

In the present case, the witnesses' "suspicions" went beyond the officers' recognizing a possibility that the defendant could be the person depicted in the videotape. None of the officers was in the store at the time the robbery occurred. Nevertheless, the officers testified that they knew the defendant personally, they saw the videotape, and they "suspected that they knew" the person depicted on the videotape was the defendant.[5] Presented in this manner, the officers each gave an opinion on the ultimate issue of the perpetrator's identity. In fact, each officer stated that, in his or her opinion, the hooded person in the videotape was the defendant. They expressed that opinion in statements such as: "After reviewing the videotape, watching the mannerism[s] and seeing what I saw in the videotape, I recognized that as [the defendant]," "I recognized [the defendant] from the video I watched," "I don't state when, I just state that I immediately recognized [the defendant]" and "[the defendant's] mannerisms, the way he walked. I could see part of his face and his

---

[5] In *Fuller*, there was nothing comparable to the videotape presented in the present case.

nose that I recognized as his." Significantly, the police witnesses did not testify about what mannerisms, facial characteristics or way of walking the videotape showed that were similar to those they previously had observed in the defendant. Had that been their testimony, it would not have been objectionable as either "mere suspicion" or opinion testimony on the ultimate issue. This is so because the jurors could have observed the defendant in the courtroom and the person on the videotape and determined for themselves if they credited the testimony and if it convinced them beyond a reasonable doubt that the person on the videotape had the same type of nose or other physical feature, or the same type of walk or other mannerism as the officers had observed in the defendant, and that therefore, the defendant was the person on the videotape participating in the robbery of the store. See *State* v. *Vilalastra*, 207 Conn. 35, 45, 540 A.2d 42 (1988) (state may not elicit expert opinion that defendant possessed drugs for sale or consumption but may ask other questions designed to elicit what items drug sellers use or whether it would be usual to find these items in apartment of someone who did not sell drugs).

In the present case, the officers' testimony amounted to opinion testimony given without any sufficient testimony to build an adequate factual foundation. The testimony should have been excluded pursuant to the court's earlier ruling on the defendant's motion in limine. The court, therefore, abused its discretion when it allowed this opinion testimony in direct contradiction of its earlier order without having revisited and changed its ruling in that regard.

Section 7-3 (a) of the Connecticut Code of Evidence provides in pertinent part: "Testimony in the form of an opinion is inadmissible if it embraces *an ultimate issue* to be decided by the trier of fact . . . ." (Emphasis added.) In construing what constitutes an ultimate

issue, I believe the appropriate definition of "ultimate," and one that may coexist in harmony with the application given § 7-3 by this court and by our Supreme Court, is "a fundamental fact or principle" that is decisive of the defendant's guilt.[6] Using this definition, to reach the ultimate issue of guilt or innocence, the trier of fact must first decide several underlying ultimate issues, namely, the elements of the crime, proof that the defendant was a perpetrator and the validity of any defenses that might excuse the defendant's acts, each of which is decisive of the defendant's guilt.

The use of this definition finds support in the following cases in which testimony was inadmissible as to a fact that would serve as a foundation for the finder of fact's final determination of guilt or liability: *Barrett* v. *Danbury Hospital*, 232 Conn. 242, 256 n.6, 654 A.2d 748 (1995) (upholding exclusion of opinion on reasonableness of plaintiff's fear); *Kowalewski* v. *Mutual Loan Co.*, 159 Conn. 76, 80, 266 A.2d 379 (1970) (upholding exclusion of opinion on whether walkway was reasonably safe for use); *State* v. *Donahue*, 141 Conn. 656, 667, 109 A.2d 364 (1954) (upholding exclusion of opinion on whether defendant acted in wilful, deliberate and premeditated manner), cert. denied, 349 U.S. 926, 75 S. Ct. 775, 99 L. Ed. 1257 (1955); *Witty* v. *Planning & Zoning Commission*, 66 Conn. App. 387, 392, 784 A.2d 1011 (upholding exclusion of opinion as to intended meaning of term in ordinance), cert. denied, 258 Conn. 950, 788 A.2d 100 (2001); *Daley* v. *Wesleyan Univ.*, 63 Conn. App. 119, 137–38, 772 A.2d 725 (upholding exclusion of opinion that "tenured faculty's decision not to recommend the plaintiff for tenure was made arbitrarily or capriciously"), cert. denied, 256 Conn. 930, 776 A.2d 1145 (2001); see *State* v. *Vilalastra*, supra, 207 Conn.

---

[6] "Fundamental" is defined, in turn, as follows: "serving as, or being an essential part of, a foundation or basis; basic; underlying . . . ." Random House Compact Unabridged Dictionary 776 (2d Ed. 1996).

39, 43. Each of these cases held that the testimony was inadmissible as an opinion on an ultimate issue in the case. To the extent that one might infer from *State* v. *Fuller*, supra, 56 Conn. App. 621, that there is one ultimate issue in a case, i.e., guilt or innocence, that interpretation would ignore these and a host of other cases from this court and from our Supreme Court.[7]

A close reading of *State* v. *Fuller*, supra, 56 Conn. App. 592, demonstrates that the identity of the perpetrator is an ultimate issue that must be decided by the trier of fact to reach the ultimate issue of guilt or innocence. The challenged testimony in *Fuller* was not deemed a ground for reversal, because, although it concerned the ultimate issue of the defendant's guilt or innocence, the testimony involved mere "suspicion," rather than "opinion," which connotes a lesser degree of certainty. Id., 620–21.

Section 7-3 of the Connecticut Code of Evidence provides an example of an ultimate issue separate from that of the defendant's guilt or innocence. Quoting General Statutes § 54-86i, § 7-3 (b) provides: "No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto, except that such expert witness may state his diagnosis of the mental state or condition of the defendant. The *ultimate issue* as to whether the defendant was criminally responsible for the crime charged is a matter for the trier of fact alone." (Emphasis added; internal quota-

---

[7] Our Supreme Court in *State* v. *Spigarolo*, 210 Conn. 359, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989), listed several examples of ultimate issues of fact that have been held to be exceptions to the rule set forth in § 7-3. Id., 373 (listing testamentary capacity, sanity, authenticity of signature, intoxication and conditions of safety).

tion marks omitted.)[8] At the very least, § 7-3 (b) explicitly sets forth the proposition that the mental state or condition of the defendant is an "ultimate issue." More than that, however, the language of § 7-3 (b) suggests that certain other elements of the crime charged and defenses thereto are also "ultimate issues," although they would not fall within the exclusion set forth in that particular subsection.

The Federal Rules of Evidence, while not binding on our courts, "are often influential in shaping our evidentiary rules." *State* v. *Vilalastra,* supra, 207 Conn. 39–40.

The state argues on appeal that the officers' testimony "falls squarely within the well recognized identification exception to the common-law rule prohibiting lay opinion testimony on an ultimate fact in issue." This argument should have been presented to the court as a challenge to the court's prohibition on opinion testimony in the present case. No such argument was made to the court at any point, however, and the court's order, therefore, remained in effect.

Inasmuch as the state now concedes that such testimony was opinion testimony on the issue of identity, the state by implication also concedes that the officers' testimony violated the court's order. The state's argument also implies that, despite offering the officers' testimony at trial for a limited purpose that would not have fallen within the category of opinion testimony, the evidence could have been used for a totally different purpose. I disagree.

In the present case, where the state circumvented the defendant's motion in limine by offering the officers' testimony for the limited purpose of showing their "suspicions," it would be inappropriate for this court to

[8] See 1 C. McCormick, Evidence (5th Ed. 1999) § 12, pp. 56–57, for a discussion of the background of the corresponding federal rule of evidence, rule 704 (b).

decide that the jury could have used the officers' testimony for a totally different purpose. See *Urich* v. *Fish*, 58 Conn. App. 176, 180–81, 753 A.2d 372 (2000) (considering evidence in contradiction of prior ruling violated plaintiff's right to due process).

The majority cites *State* v. *Strong*, 59 Conn. App. 620, 627, 757 A.2d 1186 (2000), and *State* v. *Meikle*, 60 Conn. App. 802, 811, 761 A.2d 247 (2000), cert. denied, 255 Conn. 947, 769 A.2d 63 (2001), in which the court found the disputed opinions to be ultimate issues. The majority then goes on to state: "In each of those instances, the issue we found to be ultimate could not reasonably be separated from the essence of the matter to be decided." I see no distinction in the present case. The only disputed factual issue was the perpetrator's identity, and, therefore, it could not be more essential to the matter to be decided.

I also disagree with the majority's opinion that its view of the issue "is not novel," citing *State* v. *Gagnon*, 18 Conn. App. 694, 561 A.2d 129, cert. denied, 213 Conn. 805, 567 A.2d 835 (1989). The disputed testimony in *Gagnon* was from but one police officer, not four. Id., 714. It was not first couched in suspicion. Nor did the officer state, "I recognized him as [the defendant]," or "I immediately recognized him," or " I could see part of his face and nose that I recognized as his." Instead, in *Gagnon*, the officer opined about the resemblance between a composite sketch and the defendant. Unlike the present case, the officer in *Gagnon* testified about facts concerning how the defendant's eyes, nose, mustache and the shape of his face fit the composite. Finally, the court in *Fuller* did not believe that the ultimate issue rule was inapplicable to opinions about identification, or it would not have taken the pains it did to draw a distinction between the harmlessness of mere suspicions as opposed to definite opinions. See *State* v. *Fuller*, supra, 56 Conn. App. 620–23.

I next conclude that the defendant's position was prejudiced by the court's decision to allow four witnesses to testify that the defendant was the person depicted on the videotape. The state called ten witnesses. Four of them did not identify either of the robbers. Of the six witnesses who did identify the defendant as one of the robbers, four of them were the officers who had been prohibited by the ruling on the motion in limine from expressing an opinion on the issue of identity. The fifth was the store clerk who saw the robbers for some number of seconds but less than one minute and who told the police shortly after the robbery that he could not identify the robbers. Robert Teachman, the sixth witness, who claimed that the defendant had admitted having participated in the robbery to him, was impeached by the fact that he had two felony charges pending against him in another jurisdiction. Several witnesses who were called on the defendant's behalf testified that Teachman did not have a good reputation for truthfulness. The defendant has shown that it is more probable than not that the court's ruling affected the result of the trial. See *State* v. *Lomax*, 60 Conn. App. 602, 610, 760 A.2d 957, cert. denied, 255 Conn. 920, 763 A.2d 1042 (2000). I would reverse the conviction and order a new trial.

For all these reasons, I respectfully dissent.